**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**KANSAS WASTE WATER, INC. and
WASTEWATER TREATMENT, INC.,**

      **Plaintiffs,**

      **v.**                     **Case No. 02-2605-JWL**

**ALLIANT TECHSYSTEMS, INC.,**

      **Defendant.**

_____

**MEMORANDUM AND ORDER**

This lawsuit arises from defendant Alliant Techsystems, Inc.'s alleged inducement of plaintiffs Kansas Waste Water, Inc. and Wastewater Treatment, Inc.[1] to enter into a facilities use agreement at the Sunflower Army Ammunition Plant in DeSoto, Kansas, and subsequent termination of the agreement. Plaintiffs assert common law claims for breach of contract, promissory estoppel, fraudulent misrepresentation, fraud by silence, negligent misrepresentation, and conspiracy. The matter is currently before the court on Alliant's motion for partial summary judgment on plaintiffs' tort claims (doc. 158) and plaintiffs' cross motion for partial summary judgment on their fraud by silence claim (doc. 168). For the reasons explained below, Alliant's motion is granted as to plaintiffs' civil conspiracy claim as

_____

[1] Plaintiffs are separate entities, but the distinctions between them are immaterial for purposes of resolving the motions currently before the court. Thus, for the sake of simplicity and ease of reference, the court will simply refer to them as "plaintiffs," both individually and collectively.

well as certain aspects of plaintiffs' negligent misrepresentation claim.   Alliant's motion is otherwise denied, and plaintiffs' motion is denied.

### STATEMENT OF MATERIAL FACTS

Sunflower is a 10,000-acre government-owned facility that was operated by Alliant and its predecessors from the 1940s through 2001.   The plant was originally established to produce small arms propellants during World War II.   After the war ended, it was intermittently reactivated for the production of propellants and nitroguanidine, which is a component used in the Army's propellants.   Sunflower contained a wastewater facility which was used to treat the nitroguanidine wastewater, which is a byproduct of nitroguanadine manufacturing.   This lawsuit arises from plaintiffs' sublease of that wastewater treatment facility from Alliant.

### I.   Alliant's Prime Contract at Sunflower and Plaintiffs' Facilities Use Agreement for the Wastewater Treatment Facility

Under the Armament Retooling and Manufacturing Support Initiative of 1992, Pub. L. No. 102-484, § 193 (ARMS initiative), now codified at 10 U.S.C. §§ 4551-4555, Alliant entered into a prime facilities contract with the Army dated March 10, 1995, that authorized Alliant to sublease the facilities at Sunflower for private commercial use in order to reduce the government's maintenance costs at Sunflower.   Section 10.1 of the contract provided that the contract could be terminated with thirty days' notice in the event of a national emergency or mobilization, and with 180 days' notice when doing so was in the best interests of the government.   The contract itself did not expressly state a particular term.   Alliant, however,

2

points out that under 48 C.F.R. (Federal Acquisition Regulations, or F.A.R.) § 52.245-11, the contract automatically expired five years after its execution but could be terminated by the Army "at any time."  F.A.R. § 52.245-11(b), (k).

Notwithstanding these limitations on the term of Alliant's contract with the Army, it was at that time the Army's policy that it would not terminate a prime contractor's facilities contract or a subtenant's subcontract unless a national emergency such as war made it necessary for the Army to reclaim an ammunition plant for military use.  The Army also had a policy that subcontracts entered into by prime contractors could extend beyond the term of the prime contractors' facilities contracts.  Specifically, by way of a memorandum dated January 27, 1994, Army contracting officer Douglas Borgeson stated that the Army would allow facilities contractors to enter into subcontracts that extended beyond the expiration of their facilities contracts.  Upon expiration of the prime contractor's facilities contract, those subcontracts would either be taken over by the Army or by the successor facility use contractor.

Plaintiffs are in the wastewater business and were formerly located in Kansas City, Missouri.  In the fall of 1995, plaintiffs tentatively accepted Alliant's invitation to move their operations and to lease and operate the wastewater plant at Sunflower.  On November 7, 1995, the Army gave its conditional approval to plaintiffs' proposed facilities use agreement with an estimated term of ten years and three five-year renewable options.

During contract negotiations, Alliant's Willie Gearhart presented plaintiffs with a generic draft version of a proposed facilities use agreement.  This draft stated that the

3

government could terminate Alliant's right to use the Sunflower plant.  Changes to this portion of the agreement were subsequently made in response to some statements that plaintiffs had made to Alliant.  A revised draft of the agreement stated in section 1 that it was "subject to Alliant's Facilities Contract with the Government."  The stated term of the agreement was fifteen years with two five-year options, but under Alliant's prime contract with the Army the government "ha[d] the right at any time . . . to terminate for just cause or limit Alliant's authority to use any part of [Sunflower]."  Upon such termination plaintiffs' rights to use the wastewater treatment facility would cease without recourse against Alliant.  Also attached to the draft agreement was a copy of F.A.R. § 52.245-11, which stated that facilities contracts (e.g., meaning Alliant's facilities contract with the Army) are "limited to 5 years" unless otherwise stated and that the Army "may at any time terminate or limit" a contractor's authority to use the facility.  The only specific reference to the Federal Acquisition Regulation within the facilities use agreement, however, was in paragraph 7, which requested that plaintiffs create a property control plan.

The term "just cause" was not defined within the revised version of the draft agreement itself.  Plaintiffs' principal, Thomas McNally, requested that Alliant define the term "just cause" as used in paragraph 3 and explain all of the possible ways that plaintiffs could be removed from Sunflower.  Mr. McNally testified in his deposition that Mr. Gearhart responded as follows:

> He clarified the terms upon which we could potentially be removed.  He had stated that if the facility was to start up again, required to make propellant, we would be required to make the propellant – or we would be asked to make the

4

propellant for the Army, if we had a facility use agreement at that time.  If we were already on site and operating and they required a military – the start-up of the [nitroguanidine] plant, we would be asked to do the material in conjunction with our existing waste.  If we were incapable or unwilling to treat their water, as it would be primary, then we would be removed from the facility.

. . . .

. . . He made it very clear how we could be – and what – I had asked him specifically, "Can the Army just come in and kick us out?"  He said, "No, because there is no other use for this facility.  Again, Tom, it's highly contaminated.  There is no other use for this plant.  They cannot sell it for any other use.  The Army knows that."

He had stated that they – that Alliant was on there full time, that Alliant was at that plant long term, it had long-term contracts for cleanup coming up at the facility.  It – this was the way it was going to be.  They were going to be there doing cleanup for the long haul.  So if we required – we would be there for the long haul.  And if it was required to make military propellant, we would be asked to make it.  That is why we had to have a duality built into the plan.  We could not change the plant's fundamentals.  We had to be able to treat both waste streams in that plant and make sure that the plant was not changed so dramatically that it could not be used for the production of – for the treatment of [nitroguanidine] water.

In other words, "just cause" for termination would exist in the event that the propellant manufacturing complex at Sunflower were reactivated for production and plaintiffs were unable to accommodate the government's resulting need to process nitroguanidine wastewater; otherwise, Alliant was going to be at Sunflower for the "long term" because it had long-term contracts for environmental cleanup.

Plaintiffs entered into a facilities use agreement with Alliant on or about March 20, 1996, that was in all material respects consistent with the revised draft version discussed above.  Notwithstanding the disparity between plaintiffs' agreement with a potential term of twenty-five years and the fact that Alliant's contract with the Army was only for a five-year term, both the Army and Alliant expected that all tenants would be allowed to stay at Sunflower

5

throughout their contract terms.  In fact, on April 11, 1996, the Army and Alliant entered into

an agreement modifying the 1995 prime facilities contract that authorized Alliant to enter into

subtenant contracts for periods of up to twenty-five years notwithstanding that those lengthy

subcontracts might exceed the term of Alliant's prime contract.  The modification stated that

if Alliant's prime contract expired or was terminated, the Army would require any successor

prime facilities contractor to assume the subleases.  A February 18, 1997, memorandum from

General Johnnie E. Wilson, the commanding officer of the United States Army's Materiel

Command, stated that the Army's policy on termination of tenant facility use agreements was

that "termination should be a last resort if other arrangements cannot be agreed upon with the

facility use contractor."  Termination with 180 days' notice could be used "[w]here it may be

or is necessary that a plant be operated to replenish stocks of ammunition or meet authorized

stockage levels," but termination rights should not be exercised "[i]f production for defense

requirements can be accomplished by the tenant or compatibly with commercial use of the

facilities."

## II.    **The Army's Decision to Declare the Sunflower Plant "Excess"**

During the time period when plaintiffs were negotiating with Alliant to finalize their

facilities use agreement at Sunflower, Lieutenant General John Coburn sent a memorandum

to Major General James Monroe requesting that General Monroe conduct an analysis of

inactive Army ammunition plants, including Sunflower, and the resulting cost savings that could

be obtained by reducing those plants to "caretaker" status.  The Army, in turn, faxed a

memorandum and attachments dated January 16, 1996, to Gayla Frazier, Alliant's plant

6

manager at Sunflower, informing her about the economic analysis and requesting Alliant's help in assembling data. The memorandum stated that "Higher Headquarters . . . considers the inactive plants to be 'Backup' capability and are seriously challenging continued retention unless economically justified." The economic analysis was considered to be a significant and comprehensive study because it assessed, for the first time, the impact of the ARMS initiative on inactive plants.

Attached to the memorandum as "Enclosure 2" was a document entitled "Economic Analysis – Sunflower AAP List of Alternatives/Assumptions," which identified five alternatives to be considered in analyzing the current and future status of Sunflower. Those five alternatives to be analyzed were: (1) maintain the status quo; (2) transition the nitroguanidine area to modified caretaker status; (3) continue replenishment planning with Alliant and continue facility use contracting with operating contractor; (4) continue industrial nitroguanidine emergency production readiness and initiate nitroguanidine facility maintenance through service contract competition and retaining Alliant for facility use contracting; and (5) retain replenishment mission through full and open competition and drop facility use contracting. With respect to alternative number three, the memorandum stated that "Alliant has been unsuccessful in generating significant revenues to make this alternative likely, unless a large chemical site is marketed and utilized by a tenant." According to Ken Nabb, who was the Army's lead analyst and designated point of contact for Alliant, this referred to the fact that Alliant had not been successful in bringing the MIIF (Maintenance of Inactive Industrial Facility) cost to zero, which was a primary goal of the ARMS initiative. When the MIIF is at

7

zero, the Army is not required to expend funds for plant maintenance. According to Mr. McNabb, Alliant would not be deemed successful unless it marketed and leased the nitroguanidine plant at Sunflower.[2]

Ms. Frazier routed the memorandum and attachments to various Alliant employees to inform them about the economic analysis and to obtain some of the data sought by Mr. Nabb. Mr. Gearhart was one of the persons listed on the routing slip. He testified in his deposition that it was his practice to read such documents and he probably read it.

In response to the Army's request for assistance in preparing the economic analysis, Alliant prepared a report to the Army dated February 13, 1996. Mr. Gearhart obtained information that was included in the report. In the report, Alliant warned the Army that plaintiffs had invested considerable effort in the plant and that Alliant anticipated plaintiffs would seek "substantial termination costs" and "recovery of their costs" if plaintiffs could not complete their lease.

Based on this (and other) information, the Army prepared an "Economic Analysis of the 10 Inactive Army Ammunition Plants" dated March 29, 1996, which was only three days after plaintiffs had signed their facilities use agreement. The analysis contained appendices that detailed information specific to each inactive plant, including Sunflower. The report considered several different alternatives for the Sunflower plant and concluded that changing the status of the Sunflower plant from its then-"layaway" status to a lesser retained status

_____

[2] Mr. Borgeson had also previously told Alliant that it must lease the nitroguanidine plant in order to be successful at Sunflower. Alliant never did lease the nitroguanidine plant.

would place the Army in a "high risk" for military readiness because Sunflower was the Army's sole source of nitroguanidine.    Therefore, the report recommended that Sunflower be maintained as status quo "for both readiness and fiscal reasons."    As a result of the economic analysis, the Army ultimately adopted a status-quo-plus-monitoring recommendation for Sunflower which meant that the Army would continue to monitor Alliant's efforts to lease the nitroguanidine plant.

In the fall of 1997, the Army changed its position and announced that it was recommending to Congress (which must approve all such decisions) that five of the nine plants, including Sunflower, be declared "excess" government property.    Ms. Frazier was "really surprised" when she was informed of the recommendation.    The Army's decision similarly came as a "total shock" to Mr. Borgeson and he "objected strongly" to what he believed was a "massive mistake on the part of the Army."    By way of a letter dated November 6, 1997, Ms. Frazier notified the Sunflower tenants, including plaintiffs, of the Army's plan to declare the plant excess.    Ms. Frazier's letter stated that "[t]here is a possibility, as this process progresses, the Army could decide not to excess Sunflower."    The letter also instructed plaintiffs that the Army's categorization of Sunflower as "excess" would not affect plaintiffs' agreement at Sunflower and that business should continue "as usual."    Thereafter, Alliant represented to plaintiffs that their agreement and operations at Sunflower were not jeopardized or impacted by the Army's preliminary decision to excess Sunflower.    Mr. McNally inquired about Ms. Frazier's November 6, 1997, letter immediately after he received

it.  Ms. Frazier told him "[n]ot to worry about it," "we have been down this road before," and that Alliant was actively seeking tenants.

In mid-1998, Congress approved formal excess status for Sunflower.

### III.     The Wonderful World of Oz Theme Park

While the Army was considering excessing Sunflower, in late 1996 or early 1997 Alliant's broker found a potential tenant for Sunflower which was interested in building a theme park, the Wonderful World of Oz, at Sunflower.  This group, the Oz Entertainment Company (Oz), began its negotiations with Alliant.  Because much of Sunflower is environmentally contaminated, Oz planned to assume the Army's anticipated $73 million in environmental cleanup costs at Sunflower.  Oz, however, was unwilling to acquire the property subject to plaintiffs' facilities use agreement.  It was therefore contemplated that if Oz were successful, plaintiffs' facilities use agreement would be terminated.

Mr. McNally learned in 1999 that plaintiffs would not be allowed to remain at Sunflower if Oz was successful.  But Ms. Frazier informed Mr. McNally that "there is no assurance the [Oz] conveyance agreement will be accepted or rejected" and that the pendency of the Oz Project "does not change the agreement currently in place between Alliant and [plaintiffs]."  In 1999 and 2000, plaintiffs lost customers and were unable to grow their business because of the proposed Oz deal.  Revenues were flat and plaintiffs had to layoff employees as a result of the downturn in business caused by Oz.

In 2001, plaintiffs' revenues began to increase again.  During the first part of 2001, Alliant stated that it did not know the status of the Oz project or whether it was going to be

finalized.   In March of 2001, the Johnson County Commission refused to approve the Oz project.   Jim Brooke, an Alliant employee, told Mr. McNally that even if the Army reached a deal with Oz, Mr. McNally should not worry because plaintiffs would be bought out of their facilities use agreement.   The government also confirmed the fact that, if Oz occurred, Oz would buy out the facilities use agreement.   As late as March 26, 2001, Alliant did not know if Oz would be successful.

**IV.**      **Termination/Expiration of Alliant's and Plaintiffs' Contracts**

On July 19, 1999, Alliant sent a letter to its tenants, including plaintiffs, announcing that its current contract with the Army was going to expire in March of 2000.   After this announcement, Ms. Frazier told Mr. McNally that Alliant had not decided if it was going to stay at Sunflower.   Alliant did, however, renew its contract for three six-month extensions through September of 2001.   Alliant did this at the Army's request in order to facilitate completion of the Oz deal.   Alliant made no formal announcement about leaving Sunflower after the July 1999 announcement and subsequent extensions.

In late 2000 or early 2001, Alliant determined that it was no longer in its financial interests to stay at Sunflower.   Alliant believed that it was not making enough money to justify its continued presence there.   According to the deposition testimony of Sue McKinnis, the Army's contracting officer at Sunflower, Ms. Frazier advised the government that Alliant was choosing to leave Sunflower and would not be renewing the contract when it expired on September 30, 2001.  By way of a letter dated February 6, 2001, Ms. Frazier sought guidance regarding the Army's plans for tenants to remain at Sunflower after Alliant's contract expired.

11

She advised that terminating the agreement with plaintiffs would be "troublesome."   In a letter dated March 23, 2001, Ms. McKinnis told Ms. Frazier that the Army was terminating Alliant's facilities contract effective September 30, 2001, pursuant to the 180-day "best interest of the Government" termination clause.   The letter requested that Alliant "initiate procedures with [its] tenants to vacate the facility at the end of your contract, September 30, 2001."   According to Dennis Bates, chief counsel for the Army, the Army provided Alliant with the written termination notice despite the fact that Alliant had chosen not to renew its contract because, under the terms of the Army's contract with Alliant, the Army was required to provide notice that Alliant would no longer be allowed to use the Army's facilities.

Ms. Frazier, in turn, notified plaintiffs of the termination by way of a letter dated March 27, 2001.   The letter stated that the government had "ask[ed] Alliant to proceed with a 180-day notice to tenants to vacate the facility at the end of Alliant's contract at Sunflower Army Ammunition Plant" and that plaintiffs were required to vacate Sunflower on or before September 30, 2001.   Mr. McNally first learned definitively of Alliant's plans to leave Sunflower when he received the termination notice.

Alliant and plaintiffs left the Sunflower plant on September 30, 2001.   The following month, in October of 2001, the Oz deal fell apart after the Johnson County Board of Commissioners voted to disapprove critical tax incentives and financing aid for the developer.

Based on these facts, plaintiffs assert common law claims against Alliant for breach of contract, promissory estoppel, fraudulent misrepresentation, negligent misrepresentation, fraud by silence, and conspiracy.   Alliant now seeks summary judgment on plaintiffs' tort

12

claims.    Alliant contends that it is entitled to summary judgment on these claims for three

reasons: (1) plaintiffs have failed to raise genuine issues of material fact with respect to

various elements of those claims; (2) those claims are barred by res judicata because of a 2000

Johnson County lawsuit regarding Alliant's removal of a railroad line at Sunflower; and (3)

plaintiffs' fraudulent misrepresentation, negligent misrepresentation, and fraud by silence

claims are barred by the statute of limitations.    Plaintiffs oppose summary judgment, and they

additionally contend that they are entitled to summary judgment as a matter of law on their

fraud by silence claim.

## SUMMARY JUDGMENT STANDARD[3]

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable

inferences therefrom in the light most favorable to the nonmoving party.    *Spaulding v. United*

*Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).    A fact is "material" if, under the

applicable substantive law, it is "essential to the proper disposition of the claim."    *Wright ex*

*rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler*

---

[3] Plaintiffs and Alliant have each filed a motion for summary judgment.   The court will address the motions together.    The legal standard does not change if the parties file cross motions for summary judgment.   Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.    *Atlantic Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1148 (10th Cir. 2000).

13

*v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).  To accomplish this,

14

the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

For the reasons explained below, the court finds that there is an absence of evidence in the record to support an inference of the required meeting of the minds between the Army and Alliant necessary to support plaintiffs' conspiracy claim, and therefore the court will grant summary judgment on that claim. Also, the court will also grant partial summary judgment on plaintiffs' negligent misrepresentation claim insofar as that claim is based on statements of future intent. The court will otherwise deny Alliant's motion because plaintiffs have raised genuine issues of material fact sufficient to withstand summary judgment on their fraud and fraud by silence claims and the other aspects of their negligent misrepresentation claim. The court will also deny plaintiffs' motion because Alliant has likewise raised genuine issues of material fact sufficient to withstand summary judgment on plaintiffs' fraud by silence claim. The court finds Alliant's res judicata argument to be without merit because this lawsuit arises from Alliant's termination of plaintiffs' facilities use agreement, which is a material operative fact that occurred after the Johnson County lawsuit was dismissed. Lastly, as the court held

in its previous order, the court continues to believe that genuine issues of material fact preclude summary judgment based on the statute of limitations.

## I.       Fraudulent Misrepresentation Claim

Plaintiffs' fraud claim is based on Mr. Gearhart's representations to Mr. McNally during contract negotiations that "just cause" meant that plaintiffs would be able to remain at Sunflower unless the Army needed the plant to reactivate propellant manufacturing in the event of a national emergency and plaintiffs were unable to treat the wastewater generated by the reactivated plant; and, further, that if the plant were not reactivated Alliant would be at the plant for a "long time" performing environmental cleanup.   To establish a cause of action for fraud under Kansas law, the plaintiff must show the following four elements by clear and convincing evidence: (1) an untrue statement of fact; (2) known to be true by the party making it; (3) made with the intent to deceive or recklessly made with disregard for the truth; (4) upon which the other party justifiably relies and acts to his or her detriment.  *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191, 1195 (2004).   Alliant contends that, with respect to these statements, plaintiffs' fraud claim fails to satisfy the first, third, and fourth elements listed above because plaintiffs have failed to produce evidence that they actually relied on those representations, that reliance (if any) was justifiable, the statements were made with the intent to deceive, and certain aspects of the representations were statements of predicted future events, not statements of fact.   For the following reasons, the court disagrees and denies Alliant's motion for summary judgment on this claim.

### A.       Actual Reliance

In support of its argument regarding a lack of actual reliance, Alliant contends that Mr. McNally refused to testify in his deposition that the alleged misrepresentations regarding the Army's termination rights made any difference in his decision to enter into the facilities use agreement. The excerpt from Mr. McNally's deposition upon which Alliant relies is as follows:

> Q.   Would Kansas Waste Water have entered into this facility use agreement if it had known that the Army could terminate on 180 days' notice when it determined that it was in the Army's best interest?
>
> [Plaintiffs' Counsel]:   Vague and ambiguous, calls for a legal conclusion. It calls for this witness to speculate, which I'm going to instruct him not to do.
> Answer it if you can do it without speculating.
>
> A.   Repeat your question.
>
> Q.   Would Kansas Waste Water have entered into the facility use agreement if it had known that the Army could terminate on 180 days' notice when the Army felt it was in the Army's best interest to do so?
>
> [Plaintiffs' Counsel]:   Same objection, and also it lacks foundation.
>
> A.   I think that is pure speculation, because my agreement was with Alliant.
>
> Q.   I understand your agreement was with Alliant; but if you knew that the Army could terminate Kansas Waste Water from using the facility on 180 days' notice for whatever reason the Army wanted to, if it thought it was in its best interest, would Kansas Waste Water have still entered into this agreement?
>
> [Plaintiffs' Counsel]:   Same objection.
>
> A.   That is speculation. I don't know.

In response, plaintiffs contend, first, that these questions lacked foundation because they asked Mr. McNally to speculate about a hypothetical. According to plaintiffs theory of the case, the Army did not terminate Alliant's contract. Rather, Alliant chose to let its contract expire. Furthermore, the Army did not terminate plaintiffs' facilities use agreement because the Army was not a party to that agreement. Second, plaintiffs point out a subsequent excerpt from Mr. McNally's deposition. Because Alliant has also pointed to a portion of the deposition that immediately precedes the portion relied on by plaintiffs, following is a quote from that portion of the deposition in its entirety in order to provide context to Mr. McNally's testimony:

> Q.    . . . Let's say that he told you everything that you say he should have said. Would Kansas Waste Water have entered into the facility use agreement?
>
> [Plaintiffs' Counsel]: Objection, calls for speculation. Don't speculate.
>
> A.    Yeah, that is speculation. I don't know. I would have to find the – the – the questions he would have asked – what answers he would have given.
>
> Q.    . . . Well, if you had been told that you would be terminated for the reasons that the Army has terminated you – okay. The Army has terminated Kansas Waste Water. Correct?
>
> A.    That is correct.
>
> Q.    If you had been told prior to entering into the Facility Use Agreement that the Army would terminate you *in the precise manner it has done here*, would Kansas Waste Water have entered into this Facility Use Agreement.
>
> A.    No.

18

(Emphasis added.)   Third, plaintiffs submitted an affidavit in response to Alliant's motion in which Mr. McNally stated that Alliant's insertion of and explanation of the "just cause" language were material inducements for plaintiffs to enter into the facilities use agreement and to invest substantial sums of money and assets into the facility, and that plaintiffs entered into the facilities use agreement as a result of Mr. Gearhart's explanation of the term "just cause" and Alliant's offer of a long-term contract.

Alliant contends that Mr. McNally's affidavit is simply an attempt to create a sham fact issue.   The court disagrees.   The court may not disregard an affidavit simply because it conflicts with prior deposition testimony.   *Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1282 (10th Cir. 2003); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).   Rather, the court will disregard a contrary affidavit if it serves as an attempt to create a sham issue of fact to avoid summary judgment.   *Burns*, 330 F.3d at 1281.   The court is not persuaded here that Mr. McNally's affidavit is contrary to his deposition testimony.   With respect to the first excerpt above, defense counsel's questions were targeted toward the issue of whether plaintiffs would have entered into the agreement if Mr. McNally had known about the 180-day best-interests-of-the-Army clause.   One of the controverted issues in this lawsuit, however, is whether the Army terminated Alliant's contract pursuant to that provision.   Certainly, this is Alliant's theory of the case and that theory is based on the Army's March 23, 2001, written notice to Alliant ostensibly terminating Alliant's contract pursuant to the 180-day notice provision.   But, viewing the evidence in the light most favorable to plaintiffs, Ms. McKinnis testified in her deposition that Alliant chose to leave Sunflower at the end of September 2001

and allow its contract to expire.  Mr. Bates further explained that the March 23, 2001, letter was sent because the Army had to give Alliant a written termination notice.   During oral argument, Alliant also pointed out the second excerpt from his deposition above.   In response to Alliant's counsel's question whether plaintiffs would have entered into the agreement if Mr. Gearhart had told plaintiffs everything that plaintiffs contend Mr. Gearhart should have told them, Mr. McNally's response was equivocal.   But, when viewed in context with the ensuing dialogue it may reflect that he simply was not entirely clear about what Alliant's counsel was asking.   Most significantly, though, Mr. McNally ultimately testified in his deposition that plaintiffs would not have entered into the facilities use agreement had they known that the Army would terminate plaintiffs "in the precise manner it has done here."   The affidavit speaks to the issue of Mr. McNally's actual reliance on Mr. Gearhart's representations, i.e., that plaintiffs entered into the agreement and invested substantial sums of money in the facility by relying on Mr. Gearhart's representations concerning the term "just cause."   Simply put, Alliant's argument that his deposition testimony is contrary to the affidavit fails to take into account the entirety of his deposition testimony and erroneously attempts to equate the Army's termination of its contract with Alliant pursuant to the 180-day best-interests clause (a fact which is not established) with termination of plaintiffs' agreement under the "just cause" provision of its facilities use agreement with Alliant, and the court is unpersuaded based on the record currently before the court that the two are necessarily synonymous.   Thus, the court will not disregard Mr. McNally's affidavit as an attempt to create a sham fact issue.

This affidavit, then, in conjunction with Mr. McNally's subsequent deposition testimony and other evidence of record, viewed in the light most favorable to plaintiffs, establishes that a genuine issue of material fact exists regarding whether plaintiffs actually relied on Mr. Gearhart's representations.  In addition to the affidavit and deposition testimony, it appears that plaintiffs' remarks concerning the early drafts of the facilities use agreement served as the impetus for changing the language in paragraph 3 so that the final agreement appears to have been geared toward providing plaintiffs greater assurances regarding the circumstances under which the Army could force plaintiffs to leave Sunflower.  Also, plaintiffs were relocating their entire operations to Sunflower, a task which is undoubtedly not a small one for a wastewater treatment facility, and plaintiffs entered into a long-term agreement with a potential term of twenty-five years.  Clearly, plaintiffs were seeking to move to a facility with long-term potential.  Thus, a reasonable jury could certainly find that plaintiffs actually relied on Mr. Gearhart's representations.

**B.     Justifiable Reliance**

Alliant further argues that Mr. McNally's reliance on Mr. Gearhart's representations was not justifiable because plaintiffs knew that their agreement was "subject to" Alliant's facilities contract with the Army and that the agreement could be terminated "without recourse" against Alliant, and therefore plaintiffs should have discovered the circumstances under which the Army could terminate Alliant's contract by simply asking to review that contract.  This court must attempt to predict how the Kansas Supreme Court would decide this matter.  *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005)

(federal court sitting in diversity must apply state law as announced by the highest state court). Absent controlling precedent, the federal court must attempt to predict how the state's highest court would resolve the issue. *Id.* The court must also "follow any intermediate state court decision unless other authority convinces [it] that the state supreme court would decide otherwise." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1207 n.1 (10th Cir. 2002). The court should consider analogous decisions by the state supreme court, decisions of lower courts in the state, decisions of federal and other state courts, and the general weight and trend of authority. *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 987-88 (10th Cir. 2001); *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1223 (10th Cir. 1997). Dicta from the state supreme court represents the court's own comment on the development of state law and "is an appropriate source from which this prediction may be made." *Carl v. City of Overland Park*, 65 F.3d 866, 872 (10th Cir. 1995).

In deciding the applicable legal standard on the issue of an allegedly defrauded party's duty to investigate the truthfulness of an affirmative representation under Kansas law, this court predicts that the Kansas Supreme Court would follow the approach first stated by the Kansas Court of Appeals in *Goff v. American Savings Association*, 1 Kan. App. 2d 75, 561 P.2d 897 (1977), that "[a] recipient of a fraudulent misrepresentation is justified in relying upon its truth without investigation, unless he knows or has reason to know of facts which would make his reliance unreasonable . . . the test is whether the recipient has information which would serve as a danger signal and a red light to any normal person of his intelligence and experience." *Id.* at 82, 561 P.2d at 903 (internal quotation omitted). In *Goff*, the plaintiff

homeowners filed suit against the defendant mortgagor and the defendant contractor who had built the plaintiffs' new home after it was discovered that the basement of the home leaked. During construction, the contractor had been attempting to backfill around the basement walls and had caused a wall to bow and crack in three places. Adopting and relying on the "danger signal" and "red light" standard, the appeals court held that the trial court correctly granted summary judgment on the plaintiffs' fraud claim because the plaintiffs could not have justifiably relied on an appraiser's representation "not to worry . . . drain tile would handle . . . water around the basement and . . . the basement would not leak" because the plaintiffs had seen the cracks that went all the way through the wall, had helped straighten the wall, knew that the wall had not been returned to its original position, had been refused a guarantee by the contractor that the basement would be watertight, and had been told by other contractors that the basement would not hold water out. *Id.* at 81, 561 P.2d at 903.

The Kansas Court of Appeals subsequently followed this same approach in *Sippy v. Cristich*, 4 Kan. App. 2d 511, 609 P.2d 204 (1980). *Sippy*, like *Goff*, also dealt with the sale of a home, but in *Sippy* the problem was that the home had a leaky roof. The buyers of the home had visited the home several times and noticed stains on the ceilings and floor and were aware that there had been leaks in the roof. *Id.* at 513, 609 P.2d at 207. They considered getting an independent inspection, but the sellers reassured them (via a real estate agent) that the roof had been repaired and was in good shape. *Id.* The defendants argued the plaintiffs were not justified in relying on the representation because they had noticed the water spots and in fact had personally gone to the roof to inspect it. *Id.* at 514, 609 P.2d at 208. Citing the

*Goff* "danger signal" and "red light" standard, the appeals court in *Sippy* reasoned that "it [was] of no material significance that there were water stains upon the carpet or rug" because the buyers had followed up on the danger signals by making repeated inquiries about the roof, they were assured that the roof had been repaired, and they had no reason to disbelieve the representation notwithstanding the fact that they had not obtained an independent inspection of the roof. *Id.* at 515, 609 P.2d at 208.

In plaintiffs' memorandum in opposition to Alliant's motion for summary judgment, plaintiffs rely on the approach of the Restatement (Second) of Torts § 540 (1977). Under the Restatement, a party may justifiably rely on a fraudulent misrepresentation even if he or she may have ascertained the falsity of the representation if he or she had made an investigation and even if that investigation could have been made without any considerable trouble or expense. Restatement (Second) of Torts § 540 & cmt.a (1977). This principle is grounded in the notion that a plaintiff's contributory negligence should not relieve a defendant of responsibility for fraud, which is an intentional tort. *Id.* § 545A. An exception to this general rule exists for representations which the recipient knows are false or representations that are so obviously false that they could have been discovered by the senses during a cursory glance; a plaintiff's reliance on such representations will not be considered justifiable. *Id.* §§ 540 & cmt.a, 541 & cmt.a (clarifying that the obviously false exception to the duty to investigate applies "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses").

24

Interestingly, the Kansas Court of Appeals' statement in *Goff* was a direct quotation from a 1965 draft version of the Restatement (Second) of Torts § 540 and comment (c) thereto.  The Restatement (Second) of Torts was published in 1977, which was the same year as *Goff* and presumably after *Goff* given the appeals court's reliance in *Goff* on the 1965 draft version.  The final version of the Restatement § 540 did not adopt the concept that reliance must be "reasonable" in order to be justifiable.  Furthermore, the final version did not include comment (c) which included the "danger signal" and "red light" standards that were quoted by the appeals court in *Goff*.  Although Kansas courts have since quoted this standard from *Goff*, they have not discussed it in depth and, it seems, appear to have been unaware that this standard originated from a draft version of the Restatement that ultimately was not adopted.  Thus, if the Kansas Supreme Court were once again confronted with the extent of an allegedly defrauded party's duty to investigate under the legal landscape as it exists today, the possibility certainly exists that it could lean toward the standard of the Restatement §§ 540-541 instead of adhering to the standard from *Goff* which relied on an earlier draft version of the Restatement.  This approach represents the prevailing view of American courts.  *See Field v. Mans*, 516 U.S. 59, 70-75 (1995) (recognizing that the standards of the Restatement §§ 540-541, 545A represent the generally shared common law).[4]

---

[4] If the Kansas Supreme Court were to adopt this approach, Alliant would not be entitled to summary judgment under this standard either.  Plaintiffs would have had to have engaged in a legal analysis of Alliant's contract with the Army as well as F.A.R. § 52.245-11 in order to have discovered the facts which Alliant contends that they should have discovered.  This is not the type of obvious falseness that could have been discovered by the senses during a cursory glance.  *Compare* Restatement § 540 illust. 1 (buyer's reliance on seller's representation that

Notwithstanding this arguable anomaly, this court must follow the Kansas Court of Appeals' approach in *Goff* unless other authority convinces it that the Kansas Supreme Court would decide otherwise. In this case, other analogous authority from the Kansas Supreme Court is consistent with and seems to adhere to the *Goff* standard. In a case only three years before *Goff*, *Wolf v. Brungardt*, 215 Kan. 272, 524 P.2d 726 (1974), the Kansas Supreme Court found that the plaintiffs had no duty to undertake a financial investigation of a business where the defendants had made positive assertions as to the good condition of the business and there was nothing to cause the plaintiffs to suspect that the business had a large burden of outstanding debt. *Id.* at 283-84, 524 P.2d at 735. In so holding, the court explained:

> Where, under all of the circumstances of the case, there is nothing to put the [plaintiffs] on inquiry they may continue to rely on the representations made by the appellants. The [plaintiffs] did not have a duty to investigate further. There would seem to be little doubt that while, in the ordinary business transactions of life, men are expected to exercise reasonable prudence and not rely upon others with whom they deal to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple minded or unwary.

*Id.* at 283, 524 P.2d 726, 735.

Most recently, in *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 739 P.2d 444 (1987), the Kansas Supreme Court was once again confronted with facts that arguably touched

---

land is free from incumbrances is justifiable even though the buyer could easily have learned of an unsatisfied mortgage on the land by walking across the street to the office of the register of deeds in the courthouse), *with id.* § 541 cmt. a (buyer's reliance on seller's representation that horse is sound is not justifiable if the horse is shown to the buyer before he or she buys it and the slightest inspection would have revealed that the horse only has one eye).

26

on the issue of a plaintiff's duty to investigate in the face of affirmative fraud. *Slaymaker* was an odometer fraud case in which the court found that the plaintiff did not rely on the truthfulness of the representation that the car was in "original" condition because the plaintiff never believed that statement to be true. *Id.* at 534, 739 P.2d at 451. Rather, the plaintiff relied upon the seller's representation that he could rescind the transaction if that representation was not true. *Id.* at 535, 739 P.2d at 452. As such, the Supreme Court relied on the principle that the recipient of a fraudulent misrepresentation must rely on the truth of the representation itself, not on an expectation that the other will be held liable in damages if the representation is false. *Id.* at 535-36, 729 P.2d at 452 (citing Restatement § 548). The court's reasoning actually turned on a separate consideration that is not present in this case—the plaintiff's reliance on the defendant's liability, not the misrepresentation itself. The court then went on to observe that the plaintiff cannot justifiably rely on a representation where he or she "possesses information which would be a 'red light to any normal person of intelligence and experience.'" *Id.* at 536, 729 P.2d at 452-53 (quoting *Goff*, 1 Kan. App. 2d at 82, 561 P.2d at 903). Thus, reliance is not justifiable where "the party alleging he [or she] was defrauded by the misrepresentations of another was so skeptical as to its truth that he reposed no confidence in it." *Id.*

Based on the Kansas Supreme Court's opinions in *Wolf* and *Slaymaker*, this court predicts that the Kansas Supreme Court would adhere to the *Goff* standard. Under *Wolf*, the Kansas Supreme Court suggested that although ordinarily a person does not have a duty to exercise reasonable prudence in order to protect against positive, intentional fraud, a duty of

investigation may exist where there is something "to put the [plaintiff] on inquiry." This statement is entirely consistent with the *Goff* standard subsequently adopted by the Kansas Court of Appeals. Furthermore, although *Slaymaker* is not entirely apposite here because the court's reasoning was primarily centered around the lack of actual reliance instead of the lack of justifiable reliance due to the plaintiff's failure to investigate, the court's statements in *Slaymaker* regarding justifiable reliance nonetheless represent commentary from the Kansas Supreme Court on how it believes Kansas state law has developed on this issue.[5] Thus, notwithstanding the fact that Kansas case law on this issue has largely originated with excerpts from the Restatement that ultimately were not adopted, there is no authority from the Kansas Supreme Court tending to indicate that the court would abandon its prior case law on this issue. Accordingly, the *Goff* standard applies in this case.

Under this standard, the court is unpersuaded by Alliant's argument that it is entitled to judgment as a matter of law solely because plaintiffs did not examine the terms of Alliant's contract with the Army. It is a fair inference that plaintiffs apparently recognized that the fact that their facilities use agreement was going to be "subject to" Alliant's agreement was a danger signal because they took the initiative to try to clarify how this might impact them. What plaintiffs received, in return, was the "just cause" provision and Mr. Gearhart's representation about what that term meant. Absent any further reason for plaintiffs to disbelieve Mr. Gearhart's representation at that point, then, a reasonable trier of fact could

---

[5] The court is also aware of *Alires v. McGehee*, but that case involved a contractually imposed duty to inspect. 277 Kan. 398, 410-11, 85 P.3d 1191, 1199-200 (2004).

28

conclude that there were no further danger signals or red lights to put plaintiffs on further inquiry at that point.   In this regard, this case is more like *Sippy* than *Goff*.   In *Sippy*, the plaintiffs recognized the danger signals, followed up on those danger signals by making inquiries to address their concerns, received positive assurances in return, and had "no reason to disbelieve" those assurances.   4 Kan. App. 2d at 515, 609 P.2d at 208 (finding the plaintiffs were not precluded from establishing justifiable reliance by virtue of the fact that they did not conduct an independent inspection of the roof).   By comparison, in *Goff*, the plaintiffs likewise recognized the danger signals, followed up on those danger signals by making inquiries to address their concerns, and received positive assurances in return.   But, in *Goff*, the plaintiffs knew that the assurance that the basement would not leak was questionable because, despite that assurance, the contractor had refused to guarantee that the plaintiffs' basement would be watertight, Mrs. Goff's father and also a family friend who was a building contractor had both told the plaintiffs that the basement would leak, and two cement contractors had informed the plaintiffs that the basement would never hold water out.   1 Kan. App. 2d at 81, 561 P.2d at 903. In this case, like *Sippy* and unlike *Goff*, after plaintiffs received Mr. Gearhart's assurances a reasonable trier of fact could conclude that they had no reason to suspect that Alliant would enter into a contract with plaintiffs that was beyond the scope of Alliant's subcontracting authority under its prime facilities contract with the Army.   Accordingly, the court rejects Alliant's argument that plaintiffs are precluded as a matter of law from being able to establish justifiable reliance solely because plaintiffs should have investigated the terms of Alliant's prime facilities contract with the Army.

29

In sum, whether plaintiffs' reliance on Mr. Gearhart's representation was justifiable under all of the circumstances is a question of fact and, viewing the evidence in the light most favorable to plaintiffs, a genuine issue of material fact exists on this issue that precludes summary judgment. *See, e.g.*, *Goff*, 1 Kan. App. 2d at 79, 561 P.2d at 902 ("The existence of fraud is ordinarily a question of fact to be heart by the trier of facts."); *Eckholt v. Am. Bus. Info., Inc.*, 873 F. Supp. 510, 518-19 (D. Kan. 1994) (finding a genuine issue of material fact existed as to whether the plaintiff justifiably relied on the defendants).

**C.      Intent to Deceive**

Alliant argues that the evidence does not reveal that Alliant acted with knowledge of untruthfulness or intent to deceive.  As stated previously, the applicable intent element of fraud is that the untrue statement must have been made "with the intent to deceive or recklessly made with disregard for the truth."  Viewing the evidence in the light most favorable to plaintiffs, Mr. Gearhart knew or should have known that his representations were false because he had reviewed the January 16, 1996 memorandum which revealed that the Army considered Sunflower to be excess or "backup" capacity; that the Army was seriously challenging continued retention of Sunflower unless economically justified; that the Army recognized that Alliant had been unsuccessful in generating sufficiently significant revenues to reduce the MIIF costs associated with Sunflower; and that the Army was undertaking an economic analysis to evaluate inactive facilities, including Sunflower, and then determine whether the Army should divest itself of such facilities.  Moreover, Army representatives had informed Alliant that Alliant would not be successful at Sunflower if Alliant was unable to lease the

nitroguanidine plant.    Also, Mr. Vlahakis, a senior Alliant official, had advised Alliant employees at the Sunflower plant that Alliant's current activities at Sunflower were inconsistent with Alliant's core operations; that he was dismayed that Alliant was in the environmental cleanup business and running a wastewater plant when Alliant's mainstay was manufacturing explosives; and he questioned why Alliant was still in existence at Sunflower and why the plant was not closed.    Moreover, Mr. Gearhart knew that Alliant's facilities contract at Sunflower was only for a five-year term and Alliant's right to use Sunflower was limited to five years.    Clearly, this evidence is sufficient to create a genuine issue of material fact regarding whether Mr. Gearhart made these representations, if not with intent to deceive, then at least with reckless disregard for the truth.

### D.    Prediction of Future Events

Alliant's final argument with respect to plaintiffs' fraud claim is that Mr. Gearhart's representations to the effect that Alliant was at Sunflower for a "long time" because it had "long-term" contracts are not actionable because they are predictions of future events, not statements of fact.    More precisely, Mr. McNally testified in his deposition that Mr. Gearhart told him that "Alliant was at that plant long term, it had long-term contracts for cleanup coming up at the facility. . . . They were going to be there doing cleanup for the long haul.  So . . . we would be there for the long haul."    In order to be actionable, misrepresentations "must relate to some material or present pre-existing fact, and cannot ordinarily be predicated on unfilled promises or statements as to future events."  *Edwards v. Phillips Petroleum Co.*, 187 Kan. 656, 659, 360 P.2d 23, 26 (1961).    An exception exists where evidence establishes that at the

31

time the promise was made, the promisor did not intend to perform the promised action.  *Id.* at 660, 360 P.2d at 26.  "Under those circumstances the promissor's intent is the existing fact which is fraudulently misrepresented."  *Gonzalez v. Allstate Ins. Co.*, 217 Kan. 262, 265, 535 P.2d 919, 922 (1975).   The gravamen of such a claim is the existence of substantial circumstances that support an inference of wrongful intent at the time the representation was made.  *Zhu v. Countrywide Realty Co.*, 165 F. Supp. 2d 1181, 1204 (D. Kan. 2001).   The question of whether an alleged misrepresentation is one of present fact or future intent is a question of law.  *Bittel v. Farm Cr. Servs.*, 265 Kan. 651, 665, 962 P.2d 491, 501 (1998).

In this case, Mr. Gearhart's representation that Alliant "had long-term contracts for cleanup coming up at the facility" is a statement of present fact.  Although he stated that those contracts were "coming up" at Sunflower, thus implying that the representation may have been one of future intent, he also stated that Alliant "had" those contracts.  Thus, a more fair reading of the statement is that it was one of present fact because Alliant already "had" those contracts in the sense that it had already entered into them, but those contracts were "coming up" in the sense that they were scheduled to be performed in the future.  The thrust of this representation was that Alliant already had those contracts, and thus the court concludes that the statement was one of present fact.  As such, that particular representation was not one of future intent.

As for Mr. Gearhart's other representations that Alliant was going to be at the plant "long term" and for the "long haul" and consequently plaintiffs would be there for the "long haul," those representations are statements of predicted future events.  Thus, plaintiffs must produce evidence sufficient to raise a genuine issue of material fact that Alliant acted with

32

wrongful intent at the time that Mr. Gearhart made those representations.   In this respect, the record reflects that at the time Mr. Gearhart made the representations he had reviewed the January 16, 1996, and knew that the Army was analyzing the viability of Sunflower.   Also, employees at Alliant were aware that Mr. Vlahakis had expressed displeasure with Alliant's continued presence at Sunflower.   And, Mr. Gearhart was aware that Alliant's agreement with the Army was going to expire twenty-one years before plaintiffs' agreement with Alliant was going to expire.   Although this evidence is not highly persuasive, it is sufficient to raise a genuine issue of material fact regarding whether Alliant had a present intention to remain at Sunflower for the long term (or the long haul) at the time that Mr. Gearhart made the representation to Mr. McNally.

For all of these reasons, then, Alliant's motion for summary judgment on plaintiffs' fraudulent misrepresentation claim is denied.

## II.      Negligent Misrepresentation Claim

Negligent   misrepresentation   is   a   "lesser   included"   claim   of   fraudulent misrepresentation.   It differs from fraudulent misrepresentation only in that, while fraudulent misrepresentation requires that the person who made the representation acted with knowledge or   recklessness   with   respect   to   the   representation's   falsity,   negligent   misrepresentation merely requires that the person who made the statement failed to exercise reasonable care or competence to obtain or communicate true information.   *Mahler v. Keenan Real Estate, Inc.,* 255 Kan. 593, 604, 876 P.2d 609, 616 (1994).   Alliant argues that it is entitled to summary judgment on plaintiffs' negligent misrepresentation claim for the same reasons it is entitled

33

to summary judgment on plaintiffs' fraud claim.   For the same reasons stated above with respect to plaintiffs' fraud claim, then, those arguments are likewise rejected with respect to plaintiffs' negligent misrepresentation claim with one exception.

The tort of negligent misrepresentation applies only to misrepresentations of "factual, commercial information, not to statements of future intent."   *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 221, 4 P.3d 1149, 1167 (2000) (holding statements that the defendant employer would treat employees fairly were statements of future intent that were not actionable as negligent misrepresentations); *see also Bittel v. Farm Cr. Servs.*, 265 Kan. 651, 665, 962 P.2d 491, 501 (1998) (same, statement by the defendant bank that it would continue to finance plaintiffs' farm operation).   This principle is grounded in the fact that Kansas has adopted the tort of negligent misrepresentation as set forth in the Restatement (Second) of Torts § 552. *Bittel*, 265 Kan. at 664, 962 P.2d at 500.   This section of the Restatement defines the scope of liability for information negligently supplied for the guidance of others and, by its plain terms, only imposes liability for supplying "false information" to others.   Restatement § 552(1).   Indeed, even the illustrations to § 552 involve representations of existing facts.   *Bittel*, 265 Kan. at 664-65, 962 P.2d at 499.

As discussed above, Mr. Gearhart's representations that Alliant was going to be at Sunflower for the "long term" and for the "long haul" and consequently plaintiffs would be there for the "long haul" are statements of predicted future events.   As statements of future intent rather than representations of existing facts, then, this aspect of plaintiffs' fraudulent misrepresentation claim is not actionable under Kansas law.   Accordingly, Alliant's motion for

34

summary judgment is granted with respect to this aspect of plaintiffs' negligent misrepresentation claim.

**III.      Fraud-by-Silence Claim**

Under Kansas law, in order to establish fraud by silence, the plaintiff must prove by clear and convincing evidence that (1) the defendant had knowledge of material information the plaintiff did not have and could not have discovered through the exercise of reasonable diligence; (2) the defendant had a duty to communicate that information to the plaintiff; (3) the defendant intentionally failed to communicate the information to the plaintiff; (4) the plaintiff justifiably relied on the defendant to communicate the material facts; and (5) the plaintiff was injured by the defendant's failure to communicate the material facts.  *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 260, 978 P.2d 922, 932 (1999).   Alliant's primary argument that it is entitled to summary judgment on plaintiffs' fraud-by-silence claim is that the second element is not satisfied because it owed plaintiffs no duty to speak. Plaintiffs of course dispute this, but plaintiffs also argue that they are entitled to summary judgment on the narrow issue of Alliant's liability on this claim because Alliant concealed that the Army was considering excessing and disposing of Sunflower during the same time period when Alliant was offering plaintiffs a twenty-five-year deal.

**A.      Alliant's Motion for Summary Judgment**

Plaintiffs's fraud-by-silence claim is based on its allegation that Alliant knew but intentionally did not disclose the following facts: that the Army considered Sunflower to be excess or "backup" capacity; that the Army was seriously challenging continued retention of

Sunflower unless economically justified; that Alliant had been unsuccessful in generating sufficiently significant revenues to reduce the MIIF costs associated with Sunflower; that the Army had undertaken an economic analysis to evaluate inactive facilities, including Sunflower, and then determine whether the Army should divest itself of such facilities; that Army representatives had informed Alliant that Alliant would not be successful at Sunflower if Alliant was unable to lease the nitroguanidine plant; that a senior Alliant official had advised Alliant employees at the Sunflower plant that Alliant's current activities at Sunflower were inconsistent with Alliant's core operations; that a senior Alliant official had informed Alliant employees at the Sunflower plant that he was dismayed that Alliant was in the environmental cleanup business and running a wastewater plant when Alliant's mainstay was manufacturing explosives; that a senior Alliant official asked Alliant representatives at Sunflower why Alliant was still in existence at Sunflower and why the plant was not closed; and that Alliant's facilities contract at Sunflower was only for a five-year term and Alliant's right to use Sunflower was limited to five years (collectively, the "concealed facts").   According to Mr. McNally, if plaintiffs had been aware of these material facts, plaintiffs would not have ceased operations in Missouri and moved to Sunflower and invested substantial sums of money and assets into the plant.   Alliant, however, argues that it had no duty to convey this information to plaintiffs.

The second element of a fraud by silence claim is that the defendant must have been under an obligation to communicate material facts to the plaintiff.   The existence of a duty to disclose is determined on the facts and circumstances of each case.   *Ensminger v. Terminix Int'l Co.*, 102 F.3d 1571, 1574 (10th Cir. 1996).   Kansas courts have recognized that a duty

36

to disclose may arise in two situations: (1) there is a disparity of bargaining power or of expertise between two contracting parties; or (2) the parties are in a fiduciary relationship to one another. *DuShane v. Union Nat'l Bank*, 223 Kan. 755, 760, 576 P.2d 674, 678-79 (1978). In this case, plaintiffs do not contend that Alliant owed plaintiffs a fiduciary duty of disclosure. Rather, plaintiffs argue that Alliant owed plaintiffs a duty of disclosure based on a disparity in knowledge between plaintiffs and Alliant concerning the nature of Alliant's relationship with the Army because only Alliant and the Army, not plaintiffs, were privy to the facts that Alliant allegedly concealed.

In order to prove that a defendant had a duty to disclose under the special knowledge prong, then, plaintiffs must demonstrate that defendant had some special knowledge that resulted in a disparity of bargaining power or of expertise. *DuShane*, 223 Kan. at 760, 576 P.2d at 679. This may exist if the defendant "knows that the [plaintiff] is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts." *OMI Holdings, Inc. v. Howell*, 260 Kan. at 305, 347, 918 P.2d 1274, 1300-01 (1996) (internal quotation omitted). Two other judges of this court, collecting and evaluating Kansas case law on this issue, have rejected the notion that the mere fact of superior knowledge arising from unequal access to information is sufficient, in and of itself, to create a duty of disclosure. *Meschke v. OrthAlliance, Inc.*, No. 01-1365-JTM, 2002 WL 1398635, at *2 (D. Kan. June 24, 2002); *see also Britvic Soft Drinks Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1190-91 (D. Kan. 2003) (following *Meschke* and declining

37

to find a duty to disclose based solely on superior knowledge). Rather, it is the fact of such superior knowledge combined with a relationship between the parties in the sense that there is, for example, a disparity of bargaining power or expertise reflected in the relationship, that gives rise to a duty to disclose. *Meschke*, at *2. In *Meschke*, the court found that no such duty existed because the parties were experienced in the business and were not fundamentally unequal in their bargaining or negotiating power. The court finds those cases to be persuasive because of their reasoning and also because they are consistent with other related authority on this issue. For example, in *Ensminger*, the Tenth Circuit held that the defendant termite inspection company had a duty of disclosure to prospective home buyers. In so holding, the Tenth Circuit noted that "[k]ey to this cause of action, we think, is the *unequal relationship* in which the claimant seeks particular information from a specialist upon which the recipient intends to rely or act." 102 F.3d at 1574 (emphasis added). This approach is also consistent with the general rule stated in the Restatement (Second) of Torts that there is generally no duty of disclosure between parties to a business transaction. Restatement (Second) of Torts § 551(1) & cmt. a (1977). This lawsuit arises from such a business transaction and therefore the court is unpersuaded that Alliant necessarily had a duty of disclosure simply because it had better access to this information than plaintiffs.

Nonetheless, the general rule that there is no duty of disclosure in a business transaction is not without some limitations. In *Sparks v. Guaranty State Bank*, a bank officer had represented to the holder of a returned check that the maker of the check was not in financial difficulty and was solvent, which was false. 182 Kan. 165, 167, 318 P.2d 1062, 1065

38

(1958).   These misrepresentations caused the plaintiff to forbear the remedies of self-help and

legal action against the maker of the check.   The Kansas Supreme Court held that "one who

responds to an inquiry is guilty of fraud if he . . . gives . . . misleading answers . . . even though

literally true as far as they go, or if he fails to disclose the whole truth."   *Id.* at 168, 318 P.2d

at 1065 (quotation omitted).   The court further explained that

> [e]ven though one is under no obligation to speak as to a matter, if he undertakes
> to do so, either voluntarily or in response to inquiries, he is bound not only to
> state truly what he tells, but also not to suppress or conceal and [sic] facts within
> his knowledge which will materially qualify those stated.   If he speaks at all, he
> must make a full and fair disclosure.

*Id.* at 168, 318 P.2d at 1066 (quotation omitted).   Thus, a defendant who chooses to speak is

under a duty not to mislead by disclosing only a portion of the truth.   *Sparks*, which is a case

from 1958, is consistent with the subsequently adopted approach of the Restatement (Second)

of Torts (1977):

> One party to a business transaction is under a duty to exercise reasonable care
> to disclose to the other before the transaction is consummated,
>     . . .
>     (b) matters known to him that he knows to be necessary to prevent his
> partial or ambiguous statement of the facts from being misleading; and
>     (c) subsequently acquired information that he knows will make untrue or
> misleading a previous representation that when made was true or believed to be
> so. . . .

*Id.* § 551(2) & cmts. g, h.

Thus, in this case it is the fact of Mr. Gearhart's affirmative representations, discussed

above, that give rise to a duty to disclose on plaintiffs' fraud by silence claim.   The timing of

those representations in relation to some of the allegedly concealed facts is not clear based

on the record currently before the court.   But to the extent that Alliant already knew of those concealed facts at the time Mr. Gearhart made the affirmative representations, Mr. Gearhart's representations were arguably partial or ambiguous, thus giving rise to a duty to disclose other matters known to Alliant in order to prevent Mr. Gearhart's affirmative representations from being misleading.   *See id.* § 551(2)(b).   On the other hand, to the extent that Alliant later learned of those concealed facts after Mr. Gearhart made the affirmative representations, Alliant had a duty to disclose subsequently acquired information that made Mr. Gearhart's previous representations misleading.   *See id.* § 551(2)(c).   Alliant contends that it had no duty to disclose the concealed facts because failure to do so was not misleading.   According to Alliant, none of the five alternatives listed in the January 16, 1996, memorandum called for premature termination of existing facilities use contracts.   But, viewing the evidence in the light most favorable to plaintiffs, the economic analysis undertaken in 1996 was, simply put, a big deal.   It was ordered by a three-star general and suggested that the government was considering divesting itself of inactive facilities.   Perhaps most notably, Alliant's February 13, 1996, report to the Army warned that plaintiffs had invested considerable resources in the facility and would seek substantial termination costs.   This suggests that even Alliant recognized that plaintiffs might attach quite a degree of significance to the fact that the Army was scrutinizing these issues.   Whether Alliant's failure to disclose this information was misleading, then, presents a disputed issue of material fact.   But Alliant's argument that it is entitled to judgment as a matter of law on the grounds that it owed plaintiffs absolutely <u>no</u> duty of disclosure is without merit.   Alliant owed plaintiffs a duty of disclosure to the extent that

disclosure was necessary to prevent Mr. Gearhart's affirmative representations from being misleading.

Alliant also raises a variety of other arguments why it is entitled to summary judgment on plaintiffs' fraud-by-silence claim. The court has considered these arguments and finds them to be without merit largely because genuine issues of material fact abound. One particular argument worth briefly addressing is Alliant's argument that by the exercise of reasonable diligence plaintiffs could have learned that Alliant only had a five-year renewable agreement with the government. Theoretically, that may be true because plaintiffs could have simply asked Alliant to see a copy of its contract with the Army. But, viewing the evidence in the light most favorable to plaintiffs, plaintiffs noticed that their agreement was going to be subject to Alliant's prime contract with the Army and plaintiffs asked Alliant what that meant. Alliant could have simply given plaintiffs a copy of its contract with the Army and let plaintiffs examine it themselves. Instead, though, Mr. Gearhart made affirmative representations to plaintiffs regarding the nature of Alliant's contract with the Army. Moreover, Alliant's argument on that point only pertains to plaintiffs' ability to discern the five-year term of Alliant's contract. The other concealed facts relate to Mr. Vlahakis' displeasure with Alliant being at Sunflower and the Army's January 16, 1996, request for assistance in evaluating Sunflower and Alliant's subsequent assistance to the Army in response to that request. It is for the trier of fact to determine whether plaintiffs could have discovered this information by the exercise of reasonable diligence. Accordingly, Alliant's motion for summary judgment on plaintiffs' fraud by silence claim is denied.

41

### B.      Plaintiffs' Cross-Motion for Summary Judgment

Plaintiffs' argue that they are entitled to summary judgment on their fraud by silence claim as a matter of law because the summary judgment record establishes that the Army considered Sunflower to be excess capacity; that the Army was seriously challenging continued retention of Sunflower unless economically justified; that the Army was concerned about Alliant's lack of success in generating significant revenues to reduce the MIIF costs at Sunflower; that the Army had undertaken an economic analysis to evaluate inactive facilities such as Sunflower and then determine whether the Army should divest itself of such facilities; that the Army had informed Alliant that it would not be successful at Sunflower if Alliant was unable to lease the nitroguanidine plant; that in response to the economic analysis, Alliant prepared the February 13, 1996, report wherein it warned the Army that plaintiffs had invested considerable effort in the plant and that plaintiffs would seek substantial termination costs and recovery of their costs if they could not complete the agreement; that Alliant had knowledge of these facts prior to execution of the facilities use agreement; and that the facts were material inasmuch as any reasonable person contemplating relocating a business, entering into a fifteen-year facilities use agreement, and investing millions of dollars into a wastewater treatment plant would consider these facts vitally important and directly relevant to the benefit of the proposed bargain.

Plaintiffs' motion for summary judgment on this claim is denied.  In order for plaintiffs to be entitled to summary judgment on this claim, they would have to establish each element of their fraud by silence claim by clear and convincing evidence, *Miller v. Sloan, Listrom,*

*Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 260, 978 P.2d 922, 932 (1999), with the court viewing the evidence in the light most favorable to Alliant, as the non-moving party.  Under this rigorous standard, genuine issues of material fact exist on various issues.  For example, it is not entirely clear that these facts were necessarily material.  Alliant points out that each of the five alternatives listed in the January 16, 1996, memorandum anticipated that tenants such as plaintiffs would be able to finish out the terms of their existing facilities use agreements regardless of whether the Army ultimately decided to reduce the status of those inactive ammunition plants, and therefore the fact that the Army was evaluating the economic outlook of those plants would have been irrelevant to plaintiffs' tenancy at Sunflower.  This same consideration, in conjunction with the fact that Alliant and its predecessors had served as the government contractor at Sunflower for more than fifty years and thus may have truly believed that Alliant's presence there would continue into the foreseeable future, raise a genuine issue of material fact regarding whether Alliant acted with the necessary degree of intent in failing to communicate this information to plaintiffs.  Accordingly, plaintiffs' motion for summary judgment on their fraud by silence claim is denied.

**IV.    Civil Conspiracy Claim**

In order to prove a civil conspiracy claim under Kansas law, plaintiffs must show: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."  *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 927, 811 P.2d 1220, 1226 (1991) (quotation omitted).  A civil conspiracy is not actionable without the

43

"commission of some wrong giving rise to a cause of action independent of the conspiracy." *Id.* "When all elements are present, any act done by a member of the conspiracy in furtherance of the common object and in accordance with the general plan becomes the act of all, and each conspirator is responsible for the act." *Vetter v. Morgan*, 22 Kan. App. 2d 1, 8, 913 P.2d 1200, 1206 (1995).

Alliant argues that it is entitled to summary judgment on plaintiffs' civil conspiracy claim because plaintiffs' underlying tort claims fail and consequently there is no independent actionable wrong.  This argument is without merit because plaintiffs have raised genuine issues of material fact sufficient to withstand summary judgment on their fraud, negligent misrepresentation, and fraud by silence claims.

Alliant also argues that plaintiffs have failed to show a meeting of the minds in the object or course of action.  Kansas courts have adopted the principles of the Restatement (Second) of Torts § 876 for tort liability for persons acting in concert.  *See State ex rel. Mays*, 248 Kan. at 936, 811 P.2d at 1232 (noting that § 876 corresponds to the theories of civil conspiracy and aiding and abetting under Kansas law); *Vetter*, 22 Kan. App. 2d at 7-8, 913 P.2d at 1205-06 (same).  Under the Restatement, a person is subject to tort liability for acting in concert with another if he or she:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

44

Restatement (Second) of Torts § 876 (1977).   In this case, the evidence linking the Army to Alliant's misrepresentations and omissions in conjunction with the contract negotiation process with plaintiffs[6] is that the Army approved Alliant's proposal to enter into a facilities use agreement with plaintiffs for an anticipated term of up to twenty-five years; that the Army knew the economic analysis was being undertaken while Alliant was finalizing the deal with plaintiffs; and the February 18, 1996, report from Alliant to the Army expressly warned the Army about plaintiffs' investment in the plant.   This evidence does not support a theory of liability under Restatement § 876(a), as plaintiffs do not argue that the Army itself committed any tortious act.   *See* § 876 cmt. c & illust. 3 (explaining and illustrating that a person who does not engage in tortious action is not liable under this provision).   Furthermore, the evidence does not support liability under subsection (c), as plaintiffs have raised no argument that the Army's conduct constituted a breach of any duty that it had to plaintiffs.   *Id.* cmt. e & illusts. 12, 13 (explaining and illustrating that a person who does not breach a duty to the third person is not liable under this provision).   Thus, plaintiffs' only colorable theory of liability is under subsection (b).

---

[6] Plaintiffs also point to evidence pertaining to a conspiracy between Alliant and the Army to terminate Alliant's prime contract and, correspondingly, to oust plaintiffs from Sunflower because it was mutually beneficial for them to do so.   But their arguable meeting of the minds on this particular course of action bears no relation to the alleged unlawful overt acts.   That is, the alleged unlawful overt acts which plaintiffs contend support their civil conspiracy claim consist of Alliant's misrepresentations and omissions during contract negotiations which culminated in plaintiffs executing the facilities agreement and moving to Sunflower.   Plaintiffs must show, then, that the Army conspired with Alliant to carry out this unlawful fraud on plaintiffs in order to get plaintiffs to finalize the deal at Sunflower.

Under subsection (b), the record must contain evidence from which a reasonable trier of fact could find: (1) that the Army knew Alliant's conduct constituted a breach of duty to the plaintiffs; and (2) that the Army gave Alliant substantial assistance or encouragement. Plaintiffs' claim fails on the first element.  The record contains no evidence that the Army was aware of Alliant's misrepresentations and omissions to plaintiffs.  No evidence suggests that the Army was a part of the contract negotiations between Alliant and plaintiffs.  All the Army did was give its required approval of the deal.  No evidence suggests that the Army knew that Mr. Gearhart had told plaintiffs that the only way they could be forced to leave Sunflower would be if the Army reactivated the plant and plaintiffs were unable to process the wastewater.  And no evidence suggests that the Army knew that, notwithstanding Mr. Gearhart's representations, Alliant had not warned plaintiffs that the Army was in the process of undertaking its first significant comprehensive study to evaluate the inactive ammunition plants such as Sunflower and that the Army was seriously challenging continued retention of those facilities unless doing so could be economically justified, which could prove to be problematic at Sunflower unless Alliant could lease the nitroguanidine facility.  In sum, there is no evidence that the Army knew of Mr. Gearhart's representations or that he had not been particularly forthcoming about providing plaintiffs with additional information that might impact their longevity at Sunflower.  Thus, there is no evidence that the Army and Alliant had a meeting of the minds in the relevant object or course of action, which was to induce plaintiffs to move to Sunflower by defrauding them.  Accordingly, Alliant's motion for summary judgment on plaintiffs' civil conspiracy claim is granted.  *See, e.g.*, *McKibben v. Chubb*, 840 F.2d 1525,

1533 (10th Cir. 1988) (trial court properly granted summary judgment where the plaintiff made an unsubstantiated assertion that the defendant must have been aware of the scheme).

## V.    Res Judicata[7]

On February 17, 2000, which was after the government had declared Sunflower excess in 1998 and during the pendency of the Oz project, plaintiffs filed their first lawsuit against Alliant in Johnson County District Court in response to Alliant's allegedly improper removal of railroad tracks adjacent to the plant.   The petition in that case alleged that Alliant had represented to plaintiffs that there were extensive railroad lines, including a railroad spur to the wastewater treatment plant, and that the railroad tracks were being removed in contravention of the facilities use agreement.   Consequently, plaintiffs sought damages from Alliant because of the improper railroad removal.   Apparently, the rail lines had become available for removal as a result of the Army's decision to excess the plant.   In its lawsuit plaintiffs alleged that Alliant "induced [plaintiffs] to locate and enter into a 25 year lease" at Sunflower by false "representations and/or silence and omissions."   On July 19, 2000, plaintiffs dismissed the Johnson County lawsuit with prejudice in exchange for a rent restructuring by Alliant.   Alliant now contends that this lawsuit precludes plaintiff's tort claims in this lawsuit.

Under 28 U.S.C. § 1738, federal courts must give "the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the

---

[7] Alliant clarified during oral argument that its res judicata argument is solely one of claim preclusion, not issue preclusion.

judgments emerged." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982). Thus, the preclusive effect of a state court decision in an action filed in federal court is, with limited exceptions not applicable here, determined by state law. *Guttman v. Khalsa*, 401 F.3d 1170, 1173 n.2 (10th Cir. 2005) ("[R]es judicata (or 'claim preclusion') . . . requires federal courts to give preclusive effect to state court judgments as determined by state law . . . ."); *Kester v. Shawnee Mission Unified Sch. Dist. No. 512*, 252 F. Supp. 2d 1180, 1185 (D. Kan. 2003); Restatement (Second) of Judgments § 86 (1982). Thus, this court must look to the law of the state of Kansas to determine the preclusive effect of the dismissal of the 2000 lawsuit in Johnson County.

Under Kansas law, the doctrine of res judicata prevents a party from asserting the same claim in subsequent litigation where the same facts, parties, and issues have previously been litigated before a court of competent jurisdiction. *In re Estate of Reed*, 236 Kan. 514, 519, 693 P.3d 1156, 1160 (1985). It prohibits relitigation of claims where four conditions concur: "(1) identity in the things sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity in the quality of the persons for or against whom the claim is made." *Subway Rests., Inc. v. Kessler*, 273 Kan. 969, 974, 46 P.2d 1113, 1117 (2002). With respect to the second element, the Kansas Supreme Court has followed the approach of the Restatement (Second) of Judgments in evaluating the scope of the claim in the first case. *See Stanfield v. Osborne Indus., Inc.*, 263 Kan. 388, 400-01, 949 P.2d 602, 611 (1997). The Restatement follows a transactional approach to determining what constitutes a cause of action for claim preclusion purposes. *See generally* Restatement (Second) of

48

Judgments § 24 (1982).   Under this approach, the term transaction connotes a "common nucleus of operative facts."   *Id.* § 24 cmt. b.

Certainly, plaintiffs' Johnson County lawsuit and this lawsuit arise to some extent from a common nucleus of operative facts.   Both lawsuits involve representations that Alliant made to plaintiffs during contract negotiations in order to induce plaintiffs to enter into the facilities use agreement.   And Alliant points out that at the time the Johnson County lawsuit was settled (the stipulation of dismissal was filed on August 18, 2000), plaintiffs were aware of many of the facts that ultimately gave rise to this lawsuit.   For example, by that time plaintiffs knew that their facilities use contract contained the 180-day best-interest-of-the-government termination clause, Alliant had informed plaintiffs that Alliant's facilities contract would expire in March of 2000, and plaintiffs knew that plaintiffs would have to be removed from Sunflower in order for the Oz project to go through.   But the thrust of the Johnson County lawsuit involved Alliant's removal of the railroad spur to plaintiff's wastewater facility.   According to the petition, Alliant represented to plaintiffs that rail services would be available to the wastewater facility at Sunflower, that plaintiffs relied on those representations in moving their business to Sunflower, and then plaintiffs lost business by virtue of Alliant's removal of the railroad spur to plaintiffs' facilities.   By comparison, plaintiffs' claims in this case arise from Alliant's termination of the facilities use agreement.   Thus, the two lawsuits do not arise entirely from a common nucleus of operative facts.

More importantly, though, even when two lawsuits concern "essentially the same course of wrongful conduct," the first suit does not preclude "claims which did not even then exist and

which could not possibly have been sued upon in the previous case." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955); *see also* Restatement § 24 cmt. f ("Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first."). Thus, res judicata does not apply where the modification of significant facts creates new legal conditions. *Spradling v. City of Tulsa*, 198 F.3d 1219, 1223 (10th Cir. 2000). Here, plaintiffs' claims in this lawsuit stem from Alliant's termination of the facilities use agreement, which is a material operative fact that occurred after the Johnson County lawsuit was dismissed. Although at the time the Johnson County lawsuit was terminated plaintiffs may have suspected that their facilities use agreement at Sunflower might be terminated early if the Oz deal went through (a deal that even Alliant seems to concede was never a sure thing), plaintiffs did not know until they were notified in March of 2001 that their facilities use agreement was in fact going to be terminated. Plaintiffs, then, could not have asserted any claims based on Alliant's termination of the facilities use agreement until at least March of 2001. That termination constitutes a separate transaction for res judicata purposes, and therefore plaintiffs' claims arising from that contract termination are not precluded by the Johnson County lawsuit. *See generally, e.g.*, *Minarik Elec. Co. v. Electro Sales Co.*, 223 F. Supp. 2d 334 (D. Mass. 2002) (res judicata did not bar action where the defendant was still the plaintiff's distributor at the time of the prior suit because the current suit was brought after termination of the distributorship); *Kimmel v. Iowa Realty Co.*, 339 N.W.2d 374, 379 (Iowa

50

1983) (no claim preclusion where prior action that was concluded on the basis that delinquent payments would be brought up to date because subsequent losses had not matured at that time and the plaintiffs were not aware of the defendant's alleged fraud and breach of fiduciary duty at that time); *cf. Phelps v. Hamilton*, 122 F.3d 1309, 1321 (10th Cir. 1997) (holding the plaintiffs were not collaterally estopped from litigating the issue of the defendant's bad faith with respect to six additional criminal charges that were filed after the entry of a state court ruling).

In sum, the court is unpersuaded that plaintiffs' claims in this lawsuit are precluded by the 2000 lawsuit in Johnson County that dealt with the separate issue of Alliant's removal of the rail spur and that occurred months before Alliant terminated plaintiffs' facilities use agreement, which is a material operative fact for purposes of this lawsuit.   Accordingly, Alliant's motion for summary judgment based on res judicata is denied.

## VI.   Statute of Limitations

Alliant's final argument is that it is entitled to summary judgment on plaintiffs' fraud, negligent misrepresentation, and fraud by silence claims based on the two-year statute of limitations for these claims under Kansas law.   K.S.A. § 60-513(a)(3) & (4).   Plaintiffs filed this lawsuit on December 5, 2002.   Thus, in order to be deemed timely filed within the statute of limitations, plaintiffs' fraud claims must have accrued within two years prior to that date. In a Memorandum and Order in this case dated April 18, 2003, this court denied a prior motion in which Alliant also sought summary judgment on these claims based on the statute of limitations. *See Kansas Wastewater, Inc. v. Alliant Techsystems, Inc.*, 257 F. Supp. 2d 1344

(D. Kan. 2003).   Alliant now essentially renews the motion, but this time additionally argues that discovery has revealed that plaintiffs' claims accrued prior to December of 2000 because by that time: (1) plaintiffs knew that they had suffered substantial economic damages because of a downturn in business in 1999 and 2000 caused by the looming threat of termination of the facilities use agreement in order to pave the way for Oz; and (2) discovery has revealed that Alliant did not actively conceal the possible termination because Alliant kept all of the ARMS tenants, including plaintiffs, informed of events as they unfolded.

These arguments may speak to the issue of what plaintiffs perhaps knew or should have known—i.e., that early termination of its facilities use agreement due to Oz was possible—but plaintiffs' fraud claims nonetheless did not accrue until plaintiffs suffered reasonably ascertainable, substantial injury arising from the fraud.   Although plaintiffs may have suffered a downturn in business in 1999 and 2000, as the court explained in its prior memorandum and order there is ample evidence "from which it could be inferred that Alliant lulled [plaintiffs] into believing that the [facilities use agreement] would be honored either through performance or buyout." *Id.* at 1353.   The summary judgment record continues to reflect this for the same reasons stated in the court's prior Memorandum and Order.   Simply put, Oz was never a sure thing and, taking all reasonable inferences in plaintiffs' favor, nothing foreshadowed that Alliant would terminate plaintiffs' agreement at Sunflower under circumstances that did not constitute "just cause," as Mr. Gearhart had represented that term's meaning to plaintiffs, without plaintiffs receiving adequate compensation for the termination.   Even though plaintiffs may have suffered some injury in 1999 and 2000, they were repeatedly given assurances that

they would ultimately be compensated for their loss attributable to Oz. Where, as here, the evidence is in dispute as to when the fraud should have been discovered, when substantial injury first occurred, or when that injury became reasonably ascertainable, the trier of fact must decide those issues. *Bryson v. Wichita State Univ.*, 19 Kan. App. 2d 1104, 1108-09, 880 P.2d 800, 804 (1994). Accordingly, Alliant's motion for summary judgment based on the statute of limitations is, once again, denied.

## CONCLUSION

For the foregoing reasons, Alliant's motion for partial summary judgment on plaintiffs' tort claims is granted with respect to plaintiffs' negligent misrepresentation claim insofar as that claim is based on Mr. Gearhart's representations that Alliant was going to be at Sunflower for the "long term" and for the "long haul" and consequently plaintiffs would be there for the "long haul." Alliant's motion is also granted with respect to plaintiffs' civil conspiracy claim. Alliant's motion is otherwise denied. In so holding, the court wishes to clarify that it considered and evaluated the various other arguments that Alliant raised in its motion and the court finds those arguments to be either misplaced because they seek summary judgment on theories not advanced by plaintiffs or without merit because plaintiffs have raised genuine issues of material fact to withstand summary judgment on those issues. Plaintiffs' motion for summary judgment on their fraud by silence claim is denied because genuine issues of material fact exist with respect to certain elements of that claim.

53

**IT IS THEREFORE ORDERED BY THE COURT** that Alliant's motion for partial summary judgment (doc. 158) is granted in part and denied in part as set forth above.

**IT IS FURTHER ORDERED** that plaintiffs' motion for partial summary judgment on their fraud by silence claim (doc. 168) is denied.

**IT IS SO ORDERED** this 9th day of May, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

54